[Civ. No. 649.  Third Appellate District.—April 1, 1910.]

EVANS DITCH COMPANY et al., Respondents, v. LAKE-SIDE DITCH COMPANY et al., Appellants.

Water Rights—Interference With Ditch—Mandatory Injunction— Prescriptive Title of Plaintiffs — Support of Finding and Judgment.—In an action by plaintiffs to obtain a mandatory injunction requiring defendants to remove all obstructions to the flow of sixty cubic inches of water per second of the waters of a stream in controversy into the ditch of the plaintiffs for use on their lands, it is held, upon a review of the evidence, that it supports a finding that plaintiffs and their predecessors had acquired a prescriptive title to that quantity of water as against the defendants, by adverse user for the requisite period, and that such

finding is pivotal to the judgment awarding the relief sought, which cannot be disturbed.

ID.—EFFECT OF STIPULATION AS TO PLAINTIFFS' LONG USER—PROOF OF ADVERSE USER.—A stipulation made for the purpose of trial, the language of which is unmistakable as to the use by plaintiffs and their predecessors of the quantity of water claimed for twenty years, leaves only the proof that such stipulated user was adverse, under a claim of right, and hostile to the interests of the defendants. *Held*, that the evidence warrants the rational inference that such stipulated user was open, notorious, and under a claim of right, and therefore adverse.

ID.—ACQUIESCENCE OF DEFENDANTS.—The court below from this long-continued use might have presumed the knowledge and acquiescence of defendants; but it had also the direct statements of witnesses clearly revealing such knowledge and acquiescence.

ID.—QUESTIONS OF FACT — ADVERSE USER — IMPLIED LICENSE.—The questions whether or not the user was adverse or was with the implied license of the defendants were questions of fact to be determined by the court in the light of the surrounding circumstances.

ID.—MEANS OF DIVERSION IMMATERIAL — ARTIFICIAL AND NATURAL CHANNEL.—The result as to adverse user is not affected by the circumstance that the diversion was by means both of an artificial and a natural channel, such as by a ditch and slough used by plaintiffs in the present case to divert the water to use on their land; and an appropriation so made will be as effectual as if it was carried through a ditch or pipe made for that purpose and no other.

ID.—ABSENCE OF DISTINCTION AS TO PRESCRIPTIVE RIGHT OR APPROPRIATION.—So far as respects the use both of an artificial and natural channel, there is no difference between the appropriation of water under a claim of right and for the requisite time to ripen into a title by prescription, and the case of an appropriation specifically provided for in sections 4115–4122 of the Civil Code.

ID.—USE OF WATER FOR BENEFIT OF PLAINTIFFS—SUFFICIENCY OF EVIDENCE.—*Held*, that the court was entirely justified in concluding from the evidence that the diversion of the water and its use was for the benefit of the plaintiffs; and that they being in possession when the defendants obstructed the flow of the water are presumed to be the owners thereof in the absence of a showing by defendants to the contrary, and that the water right followed the ownership of the ditch in the plaintiffs.

ID.—EVIDENCE OF PRIOR APPROPRIATION—LOW WATER IN STREAM.—Evidence showing that when the water was low in the stream diverted at the point of diversion of plaintiffs, it would not reach the ditch of defendants by seepage or otherwise, and could not be

used by them, would establish that the plaintiffs were prior appropriators, and that the defendants were trespassers in interfering therewith.

Id.—Evidence as to Amount of Water Appropriated—Admission Without Objection.—Where evidence as to the amount of water appropriated was admitted without objection, it cannot be said that the trial court was not justified in acting upon it. The estimate of such amount by a hydraulic engineer seems the best available, in the absence of contrary evidence.

Id.—Qualification of Expert Witness as Measurer of Water—Discretion of Court.—In determining the qualification of an expert witness as a measurer of water, the trial court has quite a wide discretion, and it cannot be said that it was abused in determining that he was not qualified and in striking out an answer made by such witness, which would not assist the court in determining the quantity of water to which respondents were entitled.

Id.—Evidence of Claim of Right by Plaintiffs.—Evidence was admissible to show, in aid of plaintiff's prescriptive title, declarations made by them asserting their claim of right to use the water.

Id.—Absence of Prejudicial Rulings.—It is held that the court made no prejudicial rulings upon evidence calling for a reversal of the case.

APPEAL from a judgment of the Superior Court of Tulare County, and from an order denying a new trial. W. B. Wallace, Judge.

The facts are stated in the opinion of the court.

Lamberson & Lamberson, Frank H. Short, and C. L. Russell, for Appellants.

E. O. Larkins, and Hannah & Miller, for Respondents.

BURNETT, J.—The Kaweah river, as stated by appellants, has its source in the Sierra Nevada mountains, in the eastern portion of Tulare county, and flows in a generally western direction to Tulare lake. At a point known as McKay point, where the stream emerges from the foothills, it divides into two branches, the southern one of which retains the name Kaweah and the northern one taking the name of "St. Johns river." Between these two streams there is also a natural channel called Lane slough emptying into said Kaweah river. About the year 1877 an artificial channel or

ditch was dug connecting St. Johns river with said slough, and by means thereof water was diverted from said St. Johns to the said Kaweah river. The plaintiffs are appropriators from the latter stream below the mouth of said slough and the defendants are appropriators from the St. Johns below the point where it was tapped by said ditch. In February, 1906, the plaintiffs brought this action to secure a mandatory injunction requiring the defendants to remove all obstructions that prevent the flow of water from the said St. Johns into Lane slough, and "to permit the free flow of the waters from said St. Johns river through the same to the said Kaweah river," and for general relief. The defendants admitted that they "dammed up the said canal or ditch where the same was taken out of said St. Johns river and interfered with and prevented the flow of water through the same," but it is claimed that they were entitled to said water and that plaintiffs had no interest whatever in the same, and that it had been wrongfully diverted by parties who were "not in privity or acting for or on behalf of plaintiffs or any of them."

The finding of the court upon which the controversy really hinges is, "That in the year 1877 the predecessors in interest of said plaintiffs entered upon the northeast 1/4 of the southeast 1/4. of section 2, T. 18 S., R. 26 E., M. D. M., in said county of Tulare, and excavated and dug and made a canal or ditch leading out of said St. Johns river at said point into the bed or channel of said Lane Slough and by means of said canal or ditch and the said slough diverted from said river ninety-nine and 60/100 cubic feet per second of the waters thereof, for the irrigation of their lands lying along the line of the respective ditches of plaintiffs; that at the commencement of this action, plaintiffs claimed the right to use and divert sixty cubic feet per second of said waters of said river for said purposes, and plaintiffs or their grantors or predecessors in interest, did each and every year after the year 1877, up to the 23d day of March, 1902 (when defendants filled up said ditch), divert and use for said purposes, under claim of right so to do, openly, notoriously, continuously, peaceably, exclusively, hostile to, and with the knowledge and acquiescence of defendants and each and all of them, and adversely to them, and each of them, sixty cubic

feet per second of said waters of said St. Johns river, through and by means of said ditch or canal, and the channel of said Lane slough, at all times when there was not more than two hundred cubic feet per second of water flowing in the channel of said St. Johns river at the head of said canal or ditch on said section 2.''

It is contended by appellants that this finding is utterly unsupported, in that the evidence fails to show (1) that the plaintiffs are the successors in interest of the persons who dug the ditch in question; (2) that the use of said water by plaintiffs or their predecessors was such as the statute requires in order to ripen into a title by prescription; (3) that there was any transfer of the title to the Lane slough, or the ditch or water rights connected therewith, from the original owners to plaintiffs or any of them.

Some of the other findings are assailed also, but it is recognized that said finding 5 is the vital one in controversy, and as to this finding the principal point of attack upon which appellants rely is shown in the following quotation from their brief: ''Upon the issues made by these allegations of the complaint and the denial thereof by the defendants the principal portion of the evidence in this case was introduced. The whole subject of the statute of limitations as applied to an adverse diversion of water was gone into, and it seems that the plaintiffs did not make a case which would comply with any of the rules laid down by this and other courts of last resort, under the statute of limitations. The actions of the plaintiffs and defendants resulted in producing nothing more than a scrambling possession which fluctuated from day to day during the irrigation season and was not limited to any particular time, except that some of the witnesses testified that when there was plenty of water for everybody they did not interfere with the running of the water through this ditch, and of course that kind of use by the plaintiffs would not be an invasion of the rights of the defendants.''

But in the consideration of this pivotal question and of others less important we are confronted by a stipulation entered into by the parties and filed as a record at the beginning of the trial, as follows: ''It is hereby stipulated between the parties to the above-entitled action and for the purposes

of the trial of said action, that the plaintiffs in said action are respectively the owners of the respective ditches mentioned in the complaint herein, and that the said plaintiffs and their predecessors in interest, as alleged in the complaint herein, have each severally diverted, and used, during the times mentioned in said complaint, the respective quantities of water into the said respective ditches, as alleged in said complaint, when there was that much water flowing in the said Kaweah river or Mill creek at the respective heads of the said ditches.'' It is not disputed that the water diverted from the St. Johns river through the aforesaid ditch dug in 1877 and the said Lane slough flowed into the Kaweah river above the heads of said ditches referred to in said stipulation, and that it continued in said river till it reached said ditches. Attaching, therefore, the ordinary signification to the plain and unambiguous language of the stipulation, it would seem to mean that the plaintiffs and their predecessors have used during the time mentioned in the complaint, to wit, ''for more than twenty years last past,'' the water ''turned into said Lane slough at or near its head in the said St. Johns river by means of headgates, dams and other artificial structures,'' amounting to ''as much as sixty cubic feet per second,'' and this was ''diverted and conducted down the channel of said Kaweah river and Mill creek and turned into the heads of their respective ditches,'' and it ''was used by plaintiffs during said time for the irrigation of agricultural lands lying along the line of said respective ditches, and for watering livestock kept thereon and for other useful and beneficial purposes,'' and its use ''has at all said times been made under claim of right so to do with the knowledge and acquiescence of said defendants, and each of them, uninterruptedly, openly, notoriously and hostile to said defendants and each of them, and continuously and adversely to each of them.''

Appellants claim, however, that this is extending the scope of said stipulation beyond the intention and construction of the parties. They say that ''If the parties had stipulated to that effect, there would have been nothing in the case to try. That was the whole point in the case; whether or not the plaintiffs had acquired the right to divert any water from the St. Johns river into Lane slough by means of this

ditch, and if they had done so for twenty years, there could be no doubt of their having acquired the right, but the stipulation does not purport to deal with that question in any manner whatever.    That was the contested point in the case.'' While the language of the stipulation is unmistakable as to the use by plaintiffs and their predecessors of the quantity of water alleged in the complaint for twenty years, there is some plausibility in the contention that it was not intended by defendants to admit that this use was under a claim of right and hostile to the interests of appellants.    In other words, when the parties stipulated that the plaintiffs and their predecessors ''used during the times mentioned in said complaint the respective quantities of water into the said respective ditches, as alleged in said complaint,'' the expression ''as alleged in said complaint'' was designed to apply to the quantity of water and not the manner in which it had been used.    This harmonizes with the declaration of one of the counsel for appellants made during the trial, that ''The stipulation is that the waters claimed to be diverted by the plaintiffs from the Kaweah were diverted by the plaintiffs at the time and in the manner stated when there was that much water in the river.    Of course, that don't include anything about authorization or anything of that kind.    It includes all that this witness could testify to with reference to the diversion of water from the river because it includes all that there is in the pleadings about the diversion of water from the river.''    While the foregoing statement is probably not as clear as it would be if made more deliberately, it seems that the point was intended to be emphasized that the authority or right to the use of the water was the question not covered by the stipulation, and therefore a proper subject of inquiry.    Respondents must also have so understood the stipulation, as they proceeded to introduce evidence to support their claim of the adverse character of the use. This evidence, it is earnestly insisted by appellants, falls far short of meeting the requirement of the law.    We feel assured, however, that, giving it the most favorable consideration, from said evidence a rational inference may be drawn that the use of said water by plaintiffs and their predecessors was open, notorious, exclusive, continuous and under a

claim of right, and therefore "adverse," as that term is generally used.

The testimony showing these elements of title by prescription is given by a number of witnesses. It may be that no single witness has testified to a sufficient number of facts to warrant the conclusion of the court below, as the opportunities for observation on the part of the various witnesses were somewhat circumscribed; but in the aggregate the testimony is a sufficient foundation to support the finding. Alma Hall testified: "I am acquainted with Lane slough. My first acquaintance with it, I couldn't tell you when, but in 1877 was the first time I was there on any particular occasion. In 1877 I went up there and hauled some lumber and put a headgate in about one hundred yards from the St. Johns and stayed there, I guess, about a week, cleaning out the brush and logs and things and grubbing vines. I went up there, I think, on Monday and worked until Saturday afternoon, cleaning and grubbing vines and drift and logs very near down to the Kaweah river. I was back there again in 1879. We went back to turn in some water in Lane slough or to strengthen the wing dam that was turning in the water. . . . When I got up there the wing dam had washed out in spots, so it wasn't turning any water into the slough. There was water running in there without the wing dam. I suppose it was probably a foot deep in the channel of Lane slough, something near that. I think we increased the flow of the water about one-third after we fixed the dam. Frank Duran was there in the interest of the Oakes ditch. John O'Connor was there, I suppose, for the Evans ditch. I was up there again in 1898. I was up and down it different times just passing through that county over Lane slough. I always saw water in Lane slough when there was water in the St. Johns river opposite. Sometimes it would be pretty small; sometimes quite a stream. The water went into the Kaweah river."

Peter L. Fenwick was intimately acquainted with Lane slough in the years 1882 and 1883 and saw the water running through it during those years. "It came from the St. Johns river. There was a time when a large stream was running through there and there were other times when the stream was very small; just owing to the quantity of water

that was in the river how much would come down through the ditch. It emptied into the Kaweah river.'' He further declared that the headgate was never interfered with. The waste-ways were pulled out sometimes but he did not know who did it. He testified to a conversation he had in 1883 with Mr. Johnson, the president of the Lakeside Ditch Company. He says: ''They were there at the head of Lane slough at the same time I was; there was quite a little stream of water in the river and the slough was as full as could be; they didn't do anything. I heard the parties were coming up and I met them by Cutler's bridge. We went up the river together. When we got up to Lane slough one young fellow jumped down and says, 'Here, boys, is where she is goin',' and went out to pull out my waste boards. I just reached down and tapped him on the shoulder and says, 'What are you going to do?' He says, 'I am going to take out these boards.' I says, 'No, don't you do it.' Says he, 'Why?' I says, 'That's my property.' Mr. Johnson came up then and says, 'Mr. Fenwick, ain't you joking?' I says, 'No, I am not. If this is your water you go down to Visalia and make me know that this is your water, then you needn't come up here at all. I will come back and turn it to you.' '' He further declared that Mr. Johnson told the young man who attempted to move the boards to let them alone, and that they never molested any of the boards while the witness was there.

James Evans testified that he was at Lane slough in 1878, in the summer time. ''I think there was about three feet and a half of water in Lane slough and probably eighteen or twenty or thirty feet wide. There was a good stiff stream. There was a headgate in at that time. The headgate was sixteen feet wide and about eight feet deep. It was about twenty feet long. In 1883 I was there. I went up there to see about ditch matters, for the Burch ditch, the Watson ditch, the Evans ditch and the Oakes ditch. There was a small quantity of water running in Lane slough. That was in October during the dry season. There was very little water in the St. Johns or anywhere in there.'' He testified to being there also in November, 1883, and January, 1884. On the latter date he went for the purpose of closing the headgate, as there was too much water flowing through. ''I

would go there after that maybe twice or three times in a month for about twelve years off and on. There would be sometimes a month or two, or two or three months that I wouldn't go there, but I always went there in the fall of the year when the water was low. I was an owner in the Evans ditch until 1891. I was doing work for the Watson and Burch ditches. I was working for another company, the Kaweah and Mill Creek Company. I went back there usually both in the spring and fall. Between 1884 and 1891, when there was water in the river there was water in Lane slough and if there was any water in the St. Johns river Lane slough after 1886 would draw the low water of the St. Johns and all that water run into Kaweah river at the end of Lane slough. I think I was up there in the year 1885 probably twelve or fifteen times. I did not observe that anyone had interfered with the flow of the water in the Lane slough in any way that season. I never knew of any such thing taking place. I never heard about it. There was a dam put in above the gate in 1885 across the channel that led down to Lane slough. It cut off part of the water. The dam went clear across the stream but the water run over the dam. The dam was put in there by consent. Mr. Dodge and Mr. Watson came and asked if they could put an obstruction in there after the gate wouldn't hold, so as to get more water down the St. Johns. They said they were short of water and there was too much water going down the Kaweah. They said the Kaweah river had a good deal more water in it than the St. Johns and Lane slough was drawing a big stream of water, and they asked if they could put a dam across the head. The headgate wouldn't work, and they said that if they could put a dam in at the head of Lane slough until the run of water was over, then they would take it out. Sam Evans and myself went up there when the water got down pretty low and I took a team and we pulled a portion of the dam out that day and we didn't get through, so I got one of the Dokes to pull the other part of the dam out.''

C. P. Majors testified that for three years, from 1894 to 1897, he did work at different times for the Watson ditch and ''the other ditches here, the plaintiffs in this action. I was superintendent of the Kaweah and Mill creek at the same time. I was familiar with Lane slough all the time during

those three years. Sometimes Lane slough was pretty full; other times it was not. I kept water in it all the time, turned it all down Lane slough when it was low. I did that by putting in a sand dam. When we put in the sand dam in the St. Johns why of course it all came down Lane slough except seepage. I talked with John Parr (superintendent of St. Johns River Association) at different times. He was taking water down the St. Johns. He told me he wished I would let part of it go down for a few days, then I could shut all out, and I did so, changed it there.''

W. G. Pennebaker was familiar with Lane slough from 1892 to 1897, and he testified that ''Lane slough always drew water from the St. Johns whenever there was any there. No one came up there while I was there and interfered with our taking water from Lane slough on any occasion. I never knew of any dam being put across Lane slough during the time I was going to and fro from its head. I have no knowledge of it at any other time. I don't remember of ever seeing it.''

There was much other testimony of similar import. The witnesses are positive as to the continuous diversion of the water from the St. Johns river for more than twenty years. What has been quoted shows conclusively that it was under a claim of right, as the parties diverting it exercised the usual acts of ownership. The diversion was open and notorious, effected by means of artificial contrivances which not only could be seen but were actually seen by representatives of appellants. The court below, from this long-continued use, might have presumed the knowledge and acquiescence of appellants, but it had the direct statements of the witnesses clearly revealing such knowledge and acquiescence. As the question of taxes is not involved, no element of title by prescription is wanting.

Complaint is made that the testimony as to interference is negative in its character, that from the declaration of the various witnesses for plaintiffs as to their want of knowledge or information concerning any opposition of defendants, it does not follow that the said diversion of the water was not challenged. It is not contended that the evidence is conclusive as to plaintiffs' claim, but it must be apparent that their showing, giving it full credit as we must, is as complete as is

13 Cal. App.—9

practicable, or as is required to support the inference that the water was diverted for at least five years under a claim of right and without any interference or opposition on the part of appellants, but with their full knowledge and acquiescence.

The question whether or not the user is adverse or with the implied license of the owner of the servient estate is one of fact to be determined in the light of all the surrounding circumstances. (*Thomas* v. *England,* 71 Cal. 456, [12 Pac. 491].) In *Franz* v. *Mendoca,* 131 Cal. 205, [63 Pac. 361], it is held that "where the user of a way is shown to have been continuous for the full period of limitation, unexplained, without anything in the evidence or in the circumstances of the case to indicate the contrary, it may be presumed that it was under a claim of right and adverse to the owners of the land." (See, also, *Gurnsey* v. *Antelope Creek etc. Water Co.,* 6 Cal. App. 391, [92 Pac. 326], and cases therein cited.)

The result is not affected by the circumstance that the diversion was made by means of an artificial and a natural channel. As said in *Lower Tule etc. Co.* v. *Angiola etc. Co.,* 149 Cal. 498, [86 Pac. 1081]: " . . . A person who is making an appropriation of water from a natural source or stream is not bound to carry it to the place of use through a ditch or artificial conduit, nor through a ditch or canal cut especially for that purpose. He may make use of any natural or artificial channel, or natural depression, which he may find available and convenient for that purpose, so long as other persons interested in such conduit do not object, and his appropriation so made will, so far as such means of conducting the water is concerned, be as effectual as if he had carried it through a ditch or pipe-line made for that purpose and no other."

In this respect there can be manifestly no difference between the appropriation of water under a claim of right and for the requisite time to ripen into a title by prescription and the case of the appropriation specifically provided for in the Civil Code. (Secs. 1415-1721.)

But if we interpret said stipulation of the parties as applying only to the waters in the Kaweah river at McKay point above the mouth of said Lane slough, as contended for by appellants, there is no ground upon which we would be warranted in reversing the judgment of the lower court.

Upon this theory of the stipulation it would be necessary for plaintiffs to prove that the use of the water diverted from the St. Johns river by means of said ditch and slough was under a claim of right for the statutory period. which we have already considered, and was enjoyed by plaintiffs or for their benefit or by their predecessors in interest, or else that they were prior appropriators of said waters together with the amount of said waters so appropriated. This is required by reason of the general denials of the answer and the specific allegation as to want of privity, to which we have already referred, and "that the said canal or ditch so excavated and made from the said St. Johns river to said Lane slough was not and never has been, a natural watercourse, and the plaintiffs herein have never diverted any water whatsoever from the said St. Johns river through or by means of said canal or ditch."

As to the proposition that the use was for the benefit of respondents, it is pointed out in their brief that "On the third day of November, 1877, the owners of the respective ditches now owned by plaintiffs organized themselves into a corporation known as the Kaweah and Mill Creek Water Company, and filed articles of incorporation thereof on said day. One of the main purposes of this corporation 'was to keep water in the Kaweah and Mill creek channel, the route to be adopted to be through Lane slough and any new cut the company may deem expedient to keep water in said Kaweah and Mill creek channel for irrigation and manufacturing purposes.' This company also acquired title on October 27, 1877, to the east half of the S. E. $\frac{1}{4}$ of section 2, T. 18 S., R. 26 E., upon which land, according to the answer, the canal or ditch was dug through which the water of the St. Johns river was diverted." James Evans testified that "this land was in possession of the Kaweah and Mill Creek Water Company ever since the eleventh day of May, 1882, and under its control for and on behalf of plaintiffs in this action up to the time that he left in 1891; that he came back in 1892 and was here until 1894, and it was still under their control; that said company didn't act for anybody else besides plaintiffs."

Alma Hall, a witness for plaintiffs, testified that in 1877 he went up to the head of Lane slough with Mads Johnson, Frank Duran, John O'Connor and others in the month of

November, to get water down through said slough; that they were there three days, three of them used scrapers, O'Connor for the Evans ditch and the others for the Oakes ditch. He further testified that the Kaweah and Mill Creek Water Company was turning water down for the benefit of the Evans, Watson, Fleming, Persian, Evans Extension, Oakes and Burch ditches.

From the foregoing and other testimony, some of which we have hereinbefore quoted, the court was entirely justified in concluding that the diversion of the water and its use were in behalf and for the benefit of plaintiffs. Moreover, as suggested by respondents, "plaintiff had possession of their ditches and water rights in March, 1902, when defendants obstructed the flow of the water into Lane slough, and are presumed to own such ditches and water rights in the absence of a showing by defendants to the contrary. (Code Civ. Proc., sec. 1963, subd. 11; *McGovern* v. *Mowry,* 91 Cal. 383, [27 Pac. 746]; *Zilmer* v. *Gerichten,* 111 Cal. 73, [43 Pac. 408]; *Kellogg* v. *King,* 114 Cal. 383, [55 Am. St. Rep. 74, 46 Pac. 166]; *Utt* v. *Frey,* 106 Cal. 396, [39 Pac. 807].)'' Furthermore, it was admitted that plaintiffs own the ditches connecting with the Kaweah river and Mill creek, together with the water rights thereunto belonging. But it is clear that the right to the use of the water flowing through said Lane slough into said river is an appurtenance to said ditches. The water right, therefore, would follow the ownership of the ditches to plaintiffs.

In this connection it is to be observed that there was evidence also that when the water was low in the St. Johns river at the said point of diversion into Lane slough it would not reach the head of the Lakeside ditch by seepage or otherwise. It could not have been and was not used, therefore, by appellants. Hence the respondents would be prior appropriators, and appellants stand in the attitude of trespassers.

The evidence as to the amount of water appropriated was admitted without objection, and we cannot say that the trial court was not justified in acting upon it.

L. E. McCabe, a competent hydraulic engineer, testified to making measurements and calculations, and he reached the conclusion that "with the wing dam in there would be 64.38 cubic feet per second running into the slough." This evi-

o

dence was probably the best that was available, and since no counter showing was made by defendants, the court could scarcely have disregarded the testimony of McCabe.

Certain rulings of the court as to evidence are assailed, but even if erroneous, they are not of sufficient importance to justify a reversal of the judgment.

Alma Hall was asked on cross-examination this question: "Did you at any time attempt to take that dam out of Lane slough and were you prevented by these Lakeside people from doing so?" In his direct examination he had said nothing about this particular dam, and hence the ruling was probably correct, but at any rate he substantially answered it by stating that he did take out part of the dam during that summer, and he did not remember of seeing any of the Lakeside people up there during that year.

Burton Smith, a witness for the defendants, was asked this question: "Then, from the amount of water you saw there, you estimated it to be about seven cubic feet per second? A. Yes, sir." To the question counsel for plaintiffs objected on the ground that the witness had not shown himself qualified to measure water. The objection was sustained and the answer was stricken out. In determining the competency of an expert witness the trial court has quite a wide discretion, and we are not prepared to say that it was abused in the present instance, although the witness had stated that "I had been accustomed to measure the water myself and to measuring and determining the water flowing in a stream and ascertaining the amount of cubic feet per second." In view of the objection, however, that was made, appellant should have gone more particularly into the facts disclosing the ability of the witness to estimate with some degree of accuracy the amount of water carried by the stream. But again, the question seems to have related to a particular date when the stream was observed by the witness, and there is no controversy that at times no water at all was flowing into the slough from the St. Johns and necessarily a very small quantity at other periods, and the answer of the witness would manifestly have not assisted the court in determining the maximum amount to which respondents were entitled.

The question, "Is it not a fact that from 1885 to the time you quit having anything to do with the conducting of water

through Lane slough that you took through Lane slough and were permitted to take through Lane slough, only enough water as in your judgment and in the judgment of the people representing the Lakeside Ditch Company and the St. Johns River Association was sufficient to equalize the water so that half of the water coming down the Kaweah river would run in the St. Johns river and half of it in the Kaweah river?" addressed to James Evans, manifestly called for his opinion, and was properly disallowed. His cross-examination took a wide range, and included every pertinent fact throwing any light upon the question whether the appropriation of the water was in pursuance of any understanding or otherwise.

The action of the court was clearly right in striking out as not responsive the answer of witness Bryan: "Well, the division was made there to keep the water in the Lakeside ditch as long as the water would reach the head of the ditch," to the question: "What was the division made then?" This did not call for the opinion of the witness as to the purpose for which the division was made.

The same suggestion will apply to William Dougherty's answer to the question: "What were you doing there at McKay point that year?"

Alma Hall was asked the question on cross-examination: "In 1896, isn't it a fact that there was plenty of water in the Kaweah and Mill creek for all these ditches which are plaintiffs' in this action without any water in Lane slough?" An objection was sustained on the ground that it was not proper cross-examination. In support of the ruling it is contended by respondents "that he was put on in rebuttal for the sole purpose of contradicting defendants' witnesses in regard to the interference of plaintiffs' use of the water, and this question was not properly directed to that fact," but whether this is so or not the question called for an opinion of the witness, and, besides, he had previously answered it by stating that at times there was and at other times there was not plenty of water "without the water from Lane slough."

James Evans was asked on redirect examination: "I suppose you know that these ditch companies, plaintiffs in this action, claimed that water all that time, claimed the right to use it?"

It was objected to on the ground "that the same was immaterial, irrelevant and incompetent and not redirect examination." The objection was overruled and the witness answered "Yes, sir."

In order to establish a title by "prescription" it was necessary, as we have seen, that the use was under a claim of right. This would ordinarily be shown by the acts, declarations and relation of the parties to the controversy. If the plaintiffs, during the time they were using the water, had openly declared that they claimed a right to the use of it, a witness with knowledge of that claim would be competent to testify to it. This may have been the position of Evans, and upon that assumption the question was proper. If the answer simply reflected his opinion from the acts of the parties, appellants should have shown that fact by further examination of the witness. Again, no other conclusion could have been drawn from the facts to which he testified. Hence, the ruling, if erroneous, was without prejudice.

There are some other points made by appellants but they are all of minor importance and do not justify any further attention. As already indicated, it is admitted by appellants that the decisive question in the case is the finding as to the use of the water in the requisite manner and for the statutory period to establish a title by prescription. As we read the record, there can be no possible doubt as to this point, and the judgment and the order denying the motion for a new trial are affirmed.

Hart, J., and Chipman, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 28, 1910.